811 F.2d 606
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Johnnie Lee McGHAR, Petitioner-Appellee,
v.
Theodore KOEHLER, Respondent-Appellant.
 No. 85-1177.
 United States Court of Appeals, Sixth Circuit.
 Dec. 1, 1986.
 
 Before ENGEL, KENNEDY and KRUPANSKY, Circuit Judges.
 PER CURIAM.
 
 
 1
 This case comes to us on remand from the Supreme Court in light of its decision in Rose v. Clark, 478 U.S. ___, 106 S.Ct. 3101 (1986). The parties have filed supplemental briefs on the question of whether the Sandstrom error was harmless using the harmless-error standard of Chapman v. California, 386 U.S. 18 (1967). We conclude that we can confidently say on the record as a whole that the constitutional error, the erroneous malice instruction, was harmless beyond a reasonable doubt in this case.
 
 
 2
 The facts of this case reveal a particularly vicious and rather bizarre incident. On May 12, 1974, Robert Bennett, the eventual victim, entered an Ann Arbor bar and recognized a friend, Larry Katz, who was sitting with McGhar. Bennett had never met McGhar before. A friend of McGhar's joined the group, and at about 1:30 a.m. they left to get pizza and beer, which they took to the apartment where Bennett was staying. McGhar's friend was later asked to leave because McGhar suspected he was planning to steal from the apartment. At about 4:30 or 5:00 a.m., the three who remained left in Bennett's car to drive Katz home. Bennett agreed to let McGhar stay with him in the apartment, as McGhar had no lodging for the night. Back at the apartment, however, Bennett noticed a marked change in McGhar's behavior. He asked Bennett where his money was. He began to get more and more aggressive, until he struck Bennett in the mouth, breaking several teeth. McGhar then began a forty-five minute attack on Bennett with a decorative sword that had been hanging on the wall. Bennett had handed McGhar the money in his pocket. McGhar was also searching for money in Bennett's wallet. He finally left, taking the apartment keys by mistake after looking for Bennett's car keys. The attack left Bennett mutilated and nearly dead. McGhar was charged with assault with intent to murder (Mich.Comp.Laws Sec. 750.83; Mich.Stat.Ann. Sec. 28.278) and mayhem (Mich.Comp.Laws Sec. 750.397; Mich.Stat.Ann. Sec. 28.629).
 
 
 3
 At trial, McGhar did not take the stand, but his attorney proffered a theory of defense centered on the premise that McGhar lacked the capacity to form the specific intent required to support assault with intent to murder and mayhem because of his state of intoxication. The judge instructed the jury to consider each of the two counts separately and began with the charge of assault with intent to murder. The instructions included a section on intent, to wit:
 
 
 4
 When a certain intent is a necessary element in a crime, the crime cannot have been committed when the intent did not exist.
 
 
 5
 Intent is a decision of the mind to knowingly do an act with a fully formed objective of accomplishing a specific result. There can be no crime of assault with intent to murder under our law where there is no intent to murder, and the burden rests upon the Prosecution to show a reasonable doubt--correction--to show beyond a reasonable doubt that the defendant at the time of doing the alleged act had that wrongful intent.
 
 
 6
 The intent with which a person does an act is known by the way in which he expresses it to others or indicates it by his conduct. The intent with which a person does an act can sometimes be determined from the manner in which it is done. The method used and all other facts and circumstances, but only if established by the evidence [sic].
 
 
 7
 If you find that the defendant for any reason whatever, did not consciously and knowingly act with the intent to murder, the crime cannot have been committed and you must find the defendant not guilty of the crime of assault with intent to murder.
 
 
 8
 If, from all of the evidence, you have a reasonable doubt as to whether or not the defendant knowingly and consciously acted with the intent to murder, then you must find the defendant not guilty of the crime of assault with intent to murder.
 
 
 9
 Joint Appendix at 96-7.
 
 
 10
 The judge proceeded to instruct the jury on an included offense and then said, "[t]urning now to count two ..." and instructed the jury as to the mayhem charge. It was at this point in the trial that the challenged instructions were given:
 
 
 11
 The question of intent is one that is hard to establish directly because grown persons do not always disclose the object they have in view in any acts in which they may indulge and you have to gather the intent from the character of the act, the circumstances surrounding it, and from conduct of a like character which may appear as tending to aid you in finding and discovering it, but in connection with all this unless the testimony satisfies you of something else, you are warranted in holding a party responsible for the natural, probable and legitimate consequences of his acts.
 
 
 12
 The intent may be inferred from the doing of a wrongful, fraudulent or illegal act, but this inference is not necessarily conclusive. The law presumes that every man intends the legitimate consequences of his own act. Wrongful acts knowingly or intentionally committed, can neither be justified nor excused on the ground of innocent intent.
 
 
 13
 Motive is that which recites or stimulates action. Motive is never an essential element of a crime. It is only material from the fact that it tends to show the state of mind when the act was committed. It is never necessary to show a bad motive to convict one of a crime and on the other hand, the best of motive will not exempt one from criminal responsibility of an illegal act wilfully committed.
 
 
 14
 The fact that a criminal act is wilfully done with an innocent or laudible motive will not excuse it. When an act is defined by law to be an illegal and criminal [sic], everyone is punishable who does the prohibited act without some legal justification or excuse furnished by the action and the circumstances without regard to his real motive and intention.
 
 
 15
 Joint Appendix at 99-100.
 
 
 16
 McGhar claims, and the District Court held, that the challenged instructions violated the fourteenth amendment under Sandstrom v. Montana, 442 U.S. 510 (1979).
 
 
 17
 We affirmed the District Court's grant of the writ holding that since mens rea was at issue in the case, a Sandstrom violation could not be harmless. See Conway v. Anderson, 698 F.2d 282 (6th Cir.), cert. denied, 462 U.S. 1121 (1983). Although the offensive instruction was limited to the mayhem count, it could have been applied by the jury to the assault with intent to murder count.
 
 
 18
 We now reconsider our previous opinion in light of the Supreme Court's remand. Our " 'inquiry is whether the evidence was so dispositive of intent that a reviewing court can say beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption.' " Rose v. Clark, 106 S.Ct. at 3109.
 
 
 19
 There was overwhelming evidence in the case of the defendant's assault on the victim and the extensive injuries he sustained. Defendant did not testify but his counsel argued that he lacked the requisite intent to murder because of intoxication. Although there was evidence of drinking, no one testified to intoxication. Bennett testified that McGhar was able to drive without difficulty. He was nimble in preventing the victim from escaping from the apartment. McGhar was able to leave running or hopping down the stairs. Although defendant's conduct was strange, there was evidence of intoxication in that he demanded and got what money the victim had. Defense counsel also argued that defendant may have used drugs. However, the victim stated that defendant had been in his sight most of the evening. Bennett didn't see when McGhar could have used drugs.
 
 
 20
 Moreover, the offending instruction was not the sole instruction given. How to determine intent was correctly stated elsewhere in the instructions.
 
 
 21
 We conclude after examination of the record in its entirety in this case that the jury would have found it unnecessary to rely on the presumption. Although there was evidence of some drinking, there was not evidence of intoxication which would have interfered with McGhar's ability to form intent. McGhar's use of drugs was speculative.
 
 
 22
 The judgment of the District Court is reversed and the action remanded to the District Court with instructions to deny the writ of habeas corpus.
 
 
 23
 ENGEL, Circuit Judge, concurring in part and dissenting in part.
 
 
 24
 I concur with the majority opinion with respect to reversal of the district court's grant of habeas relief based upon the invalidity of McGhar's conviction of mayhem. I would however uphold the trial court's grant of a conditional writ with respect to McGhar's conviction of assault with intent to murder.
 
 
 25
 My reading of the district judge's opinion persuades me that he was, in granting the writ as to both counts, making a value judgment based upon the record as a whole and that he concluded therefrom that he was unable to hold the violative instruction harmless beyond a reasonable doubt as we understand that concept from Chapman v. California, 386 U.S. 18 (1967). Thus while Conway v. Anderson, 698 F.2d 282 (6th Cir.), cert. denied, 462 U.S. 1121 (1983), and Engle v. Koehler, 707 F.2d 241 (6th Cir.1983), could be read as establishing a per se rule against harmlessness where mens rea was at issue, a more reasonable interpretation, and an interpretation which I believe was adopted by Judge Pratt in the district court, was that the harmless error test could apply where mens rea was at issue, although as a matter of fact it was much more difficult to apply the test because the issue of intent was more central an issue before the jury in its deliberations, not because it was for some reason automatically removed from the operation of the harmless error test itself.
 
 
 26
 As the recited facts in the majority opinion so clearly indicate, the actual assault on Bennett was bizarre and had to leave anyone confronted with those facts with at least confusion with respect to their motivation. Judge Pratt observed in his opinion in the district court:
 
 
 27
 The most troubling aspect of this motion is the overwhelming brutality involved in the case. The evidence, quite graphically, shows that plaintiff repeatedly attacked Bennet[t] and inflicted severe injuries. But the fact remains that the jury instructions are nearly indistinguishable from those found unacceptable under both Sandstrom and [People v. Wright, 408 Mich. 1, 289 N.W.2d 1 (1980) ]. It is difficult, if not impossible, to conclude that the instructions given the jury in the present case did not contribute to the plaintiff's convictions, and therefore, are not harmless error.
 
 
 28
 Similarly, in our original opinion we concluded as follows:
 
 
 29
 We are unable to conclude beyond a reasonable doubt that the jury could not have applied the erroneous intent instructions to both counts. Because both charges arose out of one assaultive act and because defendant's intent was a central issue in each case, the error was not harmless beyond a reasonable doubt. We find no error in the district court's analysis.
 
 
 30
 While the Supreme Court has vacated our original affirmance and remanded to us as it remanded Rose v. Clark itself, the purpose of remand was to insure that the harmlessness analysis included the proper considerations set forth by Justice Powell in his majority opinion. I believe that the Supreme Court in Rose v. Clark has very properly admonished appellate courts and the trial courts to consider the impact of the challenged instructions, though otherwise constitutional, in the light of all of the circumstances of the trial as they would appear to the jury at the time it heard the instructions and decided the case. The evaluation should be open-eyed and realistic and I most assuredly agree that we should not place any limitations upon the application of the harmless error rule of Chapman in considering constitutional error of the type described in Sandstrom. Our reference to the fact that the defendant's intent was a central issue recognized the focus which the trial placed upon this aspect of the case. The jury had to make determinations concerning the defendant's intent with respect to both charges, but both charges concerned the same act. The fact that the violative instruction could conceivably have been intended to relate to the mayhem charge was relevant to the question of whether it might be harmless with respect to the intent to murder charge, but not necessarily controlling. Rereading the instructions as a whole does not convince me that, if the jury considered the intent instruction at all, it did so only with respect to the mayhem charge.
 
 
 31
 In concurring in the earlier panel decision I had partially performed an analytical task imposed by Clark, but I recognize that I may have been influenced at least in some degree by uncertainty as to whether our circuit followed a per se rule excluding Chapman considerations where mens rea was at issue and where a Sandstrom violation had occurred. On further reconsideration I am led to conclude that probably no reasonable jury would have been affected by the offending instruction as applied to the mayhem charge itself. The evidence is simply too compelling. McGhar slashed about with the sword for approximately forty-five minutes obviously deriving some weird pleasure out of inflicting injury upon his victim. The actions themselves speak so clearly of an intent to commit mayhem that it is impossible to see how any instruction violative of Sandstrom could have contributed to the finding of guilt on this count.
 
 
 32
 The same observations, however, are not so true about the assault with intent to murder. In my judgment, the specific intent to cause death is not so evident from the proofs that one could say with confidence and beyond a reasonable doubt that the offending instruction did not contribute to the verdict. The bizarre nature of the crime, the extreme length of the assault, and the very fact that death did not in fact ensue leave the question of the specific intent to murder at least in issue and subject to influence by the offending instruction.
 
 
 33
 The attack of Bennett by McGhar with the decorative sword is best described as grisly. McGhar apparently became angered with Bennett when he found that Bennett did not have money or food or any more liquor. The sword was a Samurai sword which was in the apartment as a decoration, and the onslaught began when McGhar hit Bennett in the face with it. Bennett attempted to flee from the bedroom when the initial attack occurred, was tackled, and thereafter the assault continued around the apartment with Bennett at one time hiding under a table. Every time Bennett sought to escape, McGhar would prevent it and at the same time would demand that Bennett open his suitcase or that he give him money. Bennett's wounds were many and severe. His left arm was nearly completely severed, his right shoulder was cut, and the back of his skull had been cut. His right hand was severely cut and his left thumb was cut off. As horrible as all of this is, the evidence nonetheless showed that McGhar and Bennett kept up a continuing conversation during the entire assault and Bennett did not lose consciousness. And although he could easily have killed Bennett on the spot, McGhar did not. Bennett's own testimony at the trial is instructive:
 
 
 34
 Q: And do you know what time it was when Mr. McGhar left the apartment and you were discovered?
 
 
 35
 A: Almost exactly, it had to be 7:00 o'clock, 7:01 really, it was pinned down by someone who was leaving that heard the commotion.
 
 
 36
 Q: Isn't it true, Mr. Bennett, that as Mr. McGhar was leaving the apartment you thanked him for not killing you?
 
 
 37
 A: I think I did.
 
 
 38
 Q: You think you did?
 
 
 39
 A: I mumbled something to him as he was sort of unlocking the door and dashing out the door, something like at least you didn't kill me or thank God you didn't kill me, something to that effect.
 
 
 40
 Q: All right, and this was as he was leaving, is that correct?
 
 
 41
 A: Yes.
 
 
 42
 Q: Now you indicated that Mr. McGhar dashed out of the apartment, did you see him, well, the first question, pardon me strike that. How do you get from the apartment to the door leading into Mr. Smith's apartment to the ground level of this apartment building?
 
 
 43
 A: There is a small flight of stairs and steps and there is a little stairwell.
 
 
 44
 Q: So you have to go up a short flight of stairs, is that correct?
 
 
 45
 A: Um hum.
 
 
 46
 Q: Could you see Mr. McGhar as he was going up that flight of stairs?
 
 
 47
 A: Yes, he was carrying some clothes and the sword and certain
 
 
 48
 Q: All right, was there anything unusual or can you describe how he got up those stairs?
 
 
 49
 A: He was running or you know running, I guess, would be the best way to describe it.
 
 
 50
 McGhar's entire defense was focused not on any dispute as to the over conduct constituting the assault, or upon McGhar's identity as the assailant, but upon McGhar's intent. It was McGhar's defense strategy to rely upon the absence of specific intent because of the excessive use of hallucinogenic drugs and alcohol. While Bennett testified as to some alcohol consumption, it is fair to say that the actual effort to establish McGhar as being completely under the influence did not find favor with the jury and there was no proof of drug influence unless as an inference from the strange conduct. While generally denying the capability to perform any intent, the defense took a backup position in its argument to the jury that if McGhar had any intent whatsoever "that that intent was to do what he did, which was to cause great bodily harm," and that therefore, if McGhar was guilty, he was guilty of a lesser included offense but not of assault with intent to murder.
 
 
 51
 What happened was bizarre, gruesome, and shocking to the sensibilities of the jury and of the writer. Despite all of this, one is inevitably led back to the central question pounded home again and again by defense counsel: that if McGhar had desired to kill Bennett he could have done so; that instead he did not and that when finally he left he was fully aware of the fact that Bennett was alive and conscious. Bennett was able to follow McGhar out and to observe his retreat after the assault. On the other hand, the medical testimony concerning Bennett's condition showed that when he arrived at the hospital his condition was extremely grave due to the great loss of blood and the testifying physician also observed that he had by then gone into shock. The jury could quite readily have concluded that without the immediate medical attention which followed, Bennett would probably have died. Therefore, even though the jury might have been impressed by defense counsel's argument that McGhar could have killed Bennett but still deliberately left Bennett alive and conscious, it might nonetheless have understood that it was directed to presume an intent to murder from the proof of the life-threatening condition of Bennett following the assault. It is also to be remembered that the trial court presented the charge of assault with intent to kill along with the lesser but included offense of assault with intent to create great bodily injury and that the offending instruction could have made a difference in the jury determination as to the specific degree of McGhar's culpability.
 
 
 52
 The majority opinion recites, and properly so, the full instructions of the trial court with respect to intent. This included completely proper instructions as well as those which were found to violate Sandstrom. And it is true that the offending instructions were given only after the trial judge turned to the instructions concerning the crime of mayhem by quoting the appropriate language of the Michigan statute, MCL 750.397. The court then read to the jury the language of Count II which charged that Johnnie Lee McGhar "did commit the crime of mayhem by cutting the left ear, cutting off the left thumb, and disabling the left arm of Robert Willard Frances Bennett." The court then stated "the elements of this offense are set forth in the statute and information as I have read them to you." Only then did the court return to the question of intent. The jury could therefore have concluded that what followed was of general application. Nowhere in the offending instruction did the trial court limit its application to the mayhem count. Since both counts concerned the same complicated assault and since there was nothing specifically which would have limited the jury's consideration of the offending Sandstrom instruction to the mayhem count, I am left in a position where I cannot say that a reasonable jury would not have applied that language to the first count as well.
 
 
 53
 I fully share the oft-repeated admonition in Rose v. Clark that a defendant is entitled to a fair but not a perfect trial and the holding in Chapman v. California that errors of constitutional dimension do not invariably require reversal of criminal convictions. Rose v. Clark, 106 S.Ct. at 3105. Upon the particular evidence and record in this case, however, I find myself unable to conclude that the Sandstrom error in the context of the record here was harmless beyond a reasonable doubt with respect to the charge of assault with intent to murder.